541 A.2d 446

Robert S. Spotts, Petitioner *v.* Workmen's Compensation Appeal Board (Superior Tube Company), Respondents.

Submitted on briefs January 27, 1988, to Judges CRAIG and PALLADINO, and Senior Judge BARBIERI, sitting as a panel of three.

*Lawrence Sager, Sager & Sager Associates,* for petitioner.

*Robert A. Weinert,* for respondent, Superior Tube Company.

OPINION BY SENIOR JUDGE BARBIERI, May 23, 1988:

Robert S. Spotts (Claimant) petitions this Court to review the order of the Workmen's Compensation Appeal Board (Board) dismissing his claim petition. We reverse the Board and remand.

Claimant asserts he is totally disabled from chronic Trichloroethylene (TCE) poisoning as a result of twenty two years of continuous exposure to this chemical during the time he was employed by Superior Tube Company (Employer). Claimant worked in a position known as lead man. It was his responsibility to control the precision, accuracy and quality of the metal tubing produced. Claimant would set metal dies to cut tubing according to size. In order to reduce the cutting friction the tubing was pre-coated with a plastic substance known as super-coat. Once the tubing was cut, the plastic super-coat had to be removed with solvent in a process called degreasing. The tubing was lowered by overhead crane into a degreaser tank filled with solvent that was twenty-five to thirty feet in length, approximately five feet in width, extending above floor level about four and one half feet, and below floor level sixteen to eighteen feet. The cleaning solvent used to degrease the tubing, and to fill the entire tank, was TCE. When Claimant worked second shift the lead man did the degreasing (N.T. 8/16/82, pp. 27-28). On the other shifts the lead man assisted in the degreasing. In addition, every time the cutting dies had to be changed for another job, they had to be cleaned of the plastic super-coat. Claimant cleaned the dies by immersing them in a two quart can of TCE with his bare hands. On a busy day Claimant would clean the dies twenty-five to thirty times. Claimant worked as a lead man

performing these functions for eighteen years until he left the company in 1979. He never used any masks or gloves and the area where the degreaser tank was located had no forced ventilation or exhaust.

Beginning in 1967, Claimant began experiencing numbness in his hands and arms and legs, headaches, generalized weakness, nausea and blurred vision. His weight gradually dropped from 150 pounds to 85 pounds by October of 1979. Claimant saw numerous doctors and was admitted to no fewer than six different hospitals between 1967 and 1979, but no physician could conclusively diagnose what was wrong with him. During this time period he frequently complained of these physical problems to his Employer. He also lost time from work. However, neurological studies along with a computerized tomography (CAT) scan of Claimant's brain conducted at Reading Hospital on July 19, 1979, revealed no abnormalities. On October 25, 1979, Claimant informed Employer that he was unable to continue working because of his physical problems. In 1980, Claimant began treating with a chiropractor who first raised the possibility of TCE poisoning. This claim petition was filed on July 13, 1981.

Claimant was subsequently evaluated for possible TCE poisoning at Mt. Sinai Hospital on July 30, 1982. Once again neurological studies were normal. However, a second CAT scan performed on this date showed some widening of the left ventricular cistern and some mild cortical atrophy seen in the frontal region. The diagnosis of Doctor J. Kratzer was that Claimant was suffering from some cerebral atrophy abnormal for a man of his age which, based on the clinical history related to him, was caused by TCE poisoning.

Doctor Irwin Breslow testified as Claimant's medical expert. Doctor Breslow, Board certified in internal medicine and gastroenterology, examined Claimant on

December 1, 1983. He did not find any traceable levels of TCE in Claimant's blood, but did not expect to find any as the last exposure was over four years previously. He stated one of the aspects of TCE poisoning is delayed evidence of damage to the cortical areas of the brain and that a normal CAT scan in 1979, followed by a CAT scan in 1982 showing mild cortical atrophy in the frontal region of the brain was consistent with TCE damage (N.T. 2/17/84, p. 10). The widening of the left ventricular or left hemisphere of the frontal region of the brain would be evidence of right sided dysfunction (N.T. 2/17/84, pp. 11-12). Claimant is right handed. If the right hand came into contact with TCE more than the left one, this would affect more seriously the dominant left brain lobe. Doctor Breslow also pointed out that the TCE fumes contaminated the plant water fountains providing an additional hazard to Claimant, which hazard Employer was aware of through correspondence with the Department of Environmental Resources (DER) (N.T. 2/17/84, pp. 14-15, Exhibit C-4). Doctor Breslow's diagnosis, based on the clinical syndrome presented, the change in the CAT scan which he noted was an objective thing that cannot be faked, and Employer's data for TCE air contamination, was TCE poisoning (N.T. 2/17/84, p. 21).

Doctor Paul R. Casey, a specialist in internal medicine and cardiology, submitted a report on behalf of Employer. He noted that Claimant seemed to have many of the symptoms characteristic of long term exposure to TCE poisoning but could not find any neurological abnormalities or defects in Claimant with the exception of the second CAT scan. His conclusion was that Claimant's mild degree of atrophy without any explanation was probably related to contact with TCE although there was no objective or physical data to verify this conclusion.

Doctor Charles Umlauf, Board certified in psychiatry, examined Claimant on Employer's behalf. He found nothing neurologically wrong with Claimant and found it inconceivable that a toxic substance could affect the left-hand side of the brain and not the right-hand side (N.T. 2/6/85, p. 12). Doctor Umlauf was of the opinion that Claimant was either malingering, that is consciously faking symptoms for monetary gain, or that he had a conversion disorder, a type of psychoneurosis (N.T. 2/6/85, p. 19). The referee, in dismissing Claimant's petition, chose to accept Doctor Umlauf's opinion over the other physicians, finding:

18. The CAT scan of Claimant's brain taken on July 30, 1982 is questionably abnormal, the multitude of physical and neurological examinations and tests and studies done of Claimant over the years were negative or questionably abnormal, and the physicians who find Claimant disabled in total or part rely solely or in large part upon Claimant's symptoms and complaints as related to them by Claimant without verification or confirmation of their existence, and the Referee finds that Claimant has not established by persuasive, reliable and trustworthy evidence that he is disabled, or that he has TCE poisoning, and the Referee accepts the expert medical opinions of Dr. Umlauf that Claimant does not exhibit any objective evidence of a neurological defect or TCE related toxicity.

We believe this finding is not supported by substantial evidence.

First of all, the referee premises his finding on the basis that the existence of Claimant's symptoms and complaints was neither verified nor confirmed by anyone but the Claimant. This simply is not so. Two co-workers of Claimant testified that they had worked with

Claimant from 1966 to 1978 (N.T. 8/16/82, p. 12), and witnessed his gradual physical deterioration, headaches, tremendous loss of weight, sick time, and observed that during lunch hour Claimant customarily would lie down on a table because he was not feeling well (N.T. 8/16/82, pp. 15-16). This testimony is buttressed by Claimant's fourteen year medical history of an illness characterized by headaches, weight loss, blurred vision and nausea that defied diagnosis in six hospitals by numerous physicians. Even more revealing is a letter dated December 21, 1979, from Employer's plant engineer to the DER acknowledging that a TCE hazard existed at the water fountains near the degreasers and in the plant in general (N.T. 2/17/84, C-4).

Employer presented no factual testimony whatsoever to rebut Claimant's evidence. Claimant's evidence as corroborated is competent and as related in a medical history may support the conclusions of the medical experts of both Claimant and Employer who found Claimant to be suffering from TCE poisoning. *Cody v. S.K.F. Industries, Inc.*, 447 Pa. 558, 291 A.2d 772 (1972). A medical expert cannot render an opinion in a vacuum. The referee may not simply capriciously disregard an entire body of uncontradicted competent evidence, especially when this evidence is confirmed by Employer's own documents. *Farquhar v. Workmen's Compensation Appeal Board (Corning Glass Works)*, 515 Pa. 315, 528 A.2d 580, 584-585 (1987).

Secondly, the referee erred in accepting the opinion of Doctor Umlauf as unequivocal. Indeed, there are serious questions as to whether Doctor Umlauf was even qualified to testify as an expert in a TCE poisoning case. Under cross-examination Doctor Umlauf admitted that he had never seen a case of acute poisoning from TCE (N.T. 2/6/85, p. 14). Claimant's counsel then continued to cross-examine the doctor as follows:

Q. Doctor, what does the literature state are the findings associated with TCE poisoning?

A. I'm not aware of what the literature states, but if there are any findings, they were not present. There were no abnormal findings in my examination.

Q. All right. But you don't know then what findings have been associated in the literature with TCE poisoning?

A. No, I'm not aware of it. It's a very rare syndrome, and I would be inclined to look it up. If I felt that this man presented any abnormal symptoms, I would check them with the findings one might expect to turn up with an examination.

Q. But you haven't, as of the date of your testimony here today, looked up TCE poisoning?

A. That's correct. I found it unnecessary.

(N.T. 2/6/85, p. 15) Unlike credibility determinations, the question of whether medical testimony is equivocal or not is a question of competency and thus a conclusion of law fully reviewable by this Court based on the testimony taken as a whole. *Lewis v. Commonwealth,* 508 Pa. 360, 498 A.2d 800 (1985); *May Department Stores v. Workmen's Compensation Appeal Board (Smith),* 105 Pa. Commonwealth Ct. 580, 525 A.2d 33, 34 (1987). Doctor Umlauf's testimony, taken as a whole, amounts to a variety of interesting but entirely speculative opinions for which he was unable to give any support whatsoever.

Doctor Umlauf admitted that Claimant's CAT scan showed a brain abnormality but expressed the opinion that it could not be due to TCE exposure because a toxic chemical would attack both brain lobes equally rather than being more predominant in the left lobe. When asked for a specific reference in the literature to

support this statement, Doctor Umlauf replied: "No, I'm not prepared to give you one. . . ." (N.T. 2/6/85, p. 16) Doctor Umlauf's diagnosis as to what was wrong with Claimant was that Claimant was either malingering or experiencing a conversion disorder which would be a type of psychoneurosis converting some mental symptom into physical disability (N.T. 2/6/85, p. 19). The Doctor then testified that he had never seen a conversion reaction persisting for a period of 13 or 14 years after the acute symptoms have disappeared (N.T. 2/6/85, pp. 27-28). There was also no explanation as to how Claimant could fake a CAT scan showing brain damage or a weight loss from 150 to 85 pounds.

Doctor Umlauf then testified that conversion reaction or disorder is produced by a psychosocial stressor and that it was possible for TCE or toxic disability to produce this stressor (N.T. 2/6/85, p. 22). In fact, the doctor admitted that the only psychosocial stressor he identified was exposure to TCE pursuant to Claimant's employment because he did not search for any other factors (N.T. 2/6/85, p. 27). The bottom line is that Doctor Umlauf had no idea how to recognize a case of TCE poisoning, did not know what Claimant was suffering from, assumed that Claimant was simply faking, and argued that if he was not faking he was suffering from a disorder which could be related to TCE poisoning. This is equivocal testimony and it was error for the referee to rely on it.

Since we find that the referee's reliance solely upon the admittedly incompetent testimony of Doctor Umlauf, in disregard of all other medical testimony in the record and the mass of competent supporting lay testimony, leaves his findings against the Claimant unsupported by substantial evidence, we will reverse.

## ORDER

NOW, May 23, 1988, the order of the Workmen's Compensation Appeal Board at No. A-91638, dated June 16, 1987, is hereby reversed and the case remanded. Jurisdiction relinquished.